STATE OF NORTH CAROLINA v. LAWRENCE HANTON

No. COA99-1422

(Filed 5 December 2000)

**1. Criminal Law— instructions—burden of proof**

The trial court did not err in a second-degree murder prosecution in its instruction on the burden of proof where defendant contended that the court reduced the State's burden of proof by using the phrase "if you are not satisfied as to one or more of these things," but the court used "beyond a reasonable doubt" at three pivotal points in the instruction and accurately described the State's burden of proof.

**2. Criminal Law— continuance—evidence discovered the night before trial**

The trial court did not abuse its discretion in a second-degree murder prosecution by denying defendant's motion for a continuance where defendant learned the night before his trial was to begin that a witness could positively identify him as the gunman. The trial court granted defendant's counsel additional time to talk with defendant about the testimony, defense counsel effectively cross-examined the witness, and defendant's attorney had

already studied the lighting of the crime scene, the weather conditions, and the description of the gunman, and knew that the witness could describe the shooter in detail.

**3. Constitutional Law— right to remain silent—refusing to write a statement—subsequent to oral statement**

The trial court did not err in a second-degree murder prosecution by admitting testimony that defendant refused to write a statement after answering questions. The refusal to reduce a voluntarily given oral statement to writing is not an invocation of the right to remain silent.

**4. Evidence— identification of defendant by officer—prior investigation**

The trial court did not err by admitting evidence concerning a second-degree murder defendant's involvement with narcotics where a narcotics detective testified before the jury that she had seen defendant at an address behind the murder scene and had found papers there bearing his name. The testimony aided the jury in understanding the connection between a nickname and the identity of defendant, showed a link between the address and defendant, tended to show knowledge of a path used by the murderer, did not prove that defendant had committed other crimes, wrongs, or acts, and did not show that defendant had a propensity to commit murder. Even assuming the jury drew an inference from the fact that the detective was a narcotics officer, any possible prejudice would be slight in light of other strong evidence of guilt by the detective.

**5. Sentencing— prior record level—out-of-state offenses— stipulation**

The trial court erred when sentencing defendant for second-degree murder in the calculation of his prior record level. A defendant may stipulate that out-of-state offenses are substantially similar to corresponding North Carolina offenses, but it is not clear that this defendant was stipulating that his out-of-state convictions were substantially similar to charges under North Carolina law.

Appeal by defendant from judgment entered 24 March 1999 by Judge Richard D. Boner in Cleveland County Superior Court. Heard in the Court of Appeals 12 October 2000.

## STATE v. HANTON

[140 N.C. App. 679 (2000)]

On 22 March 1999, defendant Lawrence Hanton was tried before a Cleveland County jury for the murder of Donnell Williamson. Evidence for the State tended to show that during the early morning hours of 27 July 1998, defendant Hanton, also known as "Fu," attended a party at the home of Robert Taylor in Shelby, North Carolina. During the party, there were several arguments, some of which became violent. One of the arguments was between defendant and an individual named Kareem. The two men exchanged words, but were kept apart by Taylor and one of the party guests, Donnell Williamson. Taylor detained defendant in the kitchen at the rear of the house, while Williamson kept Kareem in the front area of the house. Shortly thereafter, defendant left the party.

Williamson broke up another fight and then left the party on foot, because he had loaned his car to another person earlier in the evening. As Williamson was walking home in the rain, Levi Miller, a friend of Williamson's, picked him up in Miller's automobile. Miller parked in the lighted parking lot of a beauty parlor where he and Williamson sat talking. A man walked out of the adjacent woods, crossed the parking lot, and approached the Miller automobile. Williamson asked Miller to roll down the window on the passenger side where Williamson was seated, and Miller did so. The man standing outside the car then said, "What's up?" and Williamson responded that he and Miller were on their way home. The man then stuck a gun inside the car and shot Williamson four times. Miller quickly exited the car and ran across the parking lot, where he remained until the gunman began walking back to the woods. Miller then ran back to the car, where Williamson was still seated. Williamson was gasping for breath, but was still conscious. Miller asked him, "Do you know who done it?" to which Williamson replied, "Fu." Miller then drove Williamson to the hospital, where he later died from his wounds. Miller was questioned by police officers at the hospital, and gave them a statement. Miller stated that Williamson told him "Fu" shot him. He also told police that the gunman was wearing a gray shirt with writing on it and blue jeans. He said the gunman was about 5'9", 180 pounds, and had a stocky build. Miller was later asked to look at a photo lineup and identified a photograph of "Fu," whose real name is Lawrence Hanton, as the gunman who killed Donnell Williamson.

Police then went to defendant's apartment, which was behind the parking lot where Williamson was shot, and arrested defendant for second-degree murder. After defendant was advised of his *Miranda*

rights, he made an oral statement to Investigator Price. Defendant refused to sign any papers, stating that he was "no dummy" and that he refused to be fooled by the police officer's "little tricks." The police later searched the apartment where defendant was living, and found a gray t-shirt and blue jeans, both of which were slightly damp.

Defendant testified that he paged his girlfriend, Tracy Brown, sometime after 1:00 a.m. on 27 July. He said he went to her place, and that Torsha Surratt picked them up and took them to her apartment, where they stayed together until Ms. Brown was driven back to her apartment, sometime just before sunrise.

Several witnesses placed defendant at Robert Taylor's party on 27 July, while others identified defendant as "Fu" and confirmed the clothing he was wearing at the party. Robert Taylor testified that he was on his front porch and had a good view of the parking lot where Miller's car was parked. Taylor stated he saw a man in jeans and a hooded sweatshirt come up a path from the woods, stick a gun into Miller's car, and fire four times. He stated that Lawrence Hanton, also known as "Fu," was the gunman.

Defendant was found guilty of second-degree murder for the shooting death of Donnell Williamson, and appealed from a judgment of imprisonment.

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Anne M. Gomez, for defendant appellant.*

*Attorney General Michael F. Easley, by Special Deputy Attorney General H. Alan Pell, for the State.*

HORTON, Judge.

Defendant argues that the trial court erred by (I) giving an incorrect instruction on the State's burden of proof; (II) denying defendant's motion for a continuance; (III) allowing two State's witnesses to testify about defendant's invocation of the right to remain silent; (IV) overruling defendant's objections to highly prejudicial evidence that he was involved in narcotics; and (V) incorrectly determining defendant's prior record level. We disagree with defendant's first four arguments and affirm his conviction. However, we remand the case to the trial court for resentencing at the proper record level.

STATE v. HANTON

[140 N.C. App. 679 (2000)]

I. Instructions on the State's Burden of Proof

[1] In its instructions to the jury, the trial court stated:

So I charge, ladies and gentlemen, if the State has proved to you beyond a reasonable doubt that the defendant, Lawrence Hanton, intentionally and with malice killed Donnell Allen Williamson with a deadly weapon, and that the act of Lawrence Hanton was a proximate cause of the death of Donnell Allen Williamson, then it would be your duty to return a verdict of guilty of second degree murder.

On the other hand, if you are not satisfied as to one or more of these things, then it would be your duty to return a verdict of not guilty.

Defendant correctly states that an instruction which lessens the State's burden of proof to anything less than "beyond a reasonable doubt" is grounds for a new trial. *State v. Brady*, 238 N.C. 407, 410, 78 S.E.2d 129, 131 (1953). Here, defendant focuses on the phrase "if you are not satisfied as to one or more of these things [the elements of second degree murder]" and argues that this lowers the burden of proof from "beyond a reasonable doubt" to "the satisfaction of the jury." While this phrase does not contain the words "beyond a reasonable doubt," it cannot be read in isolation. When reviewing a jury instruction for error, the Court must construe it contextually. " '[I]n determining the propriety of the trial judge's charge to the jury, the reviewing court must consider the instructions in their entirety, and not in detached fragments.' " *State v. Hartman*, 344 N.C. 445, 467, 476 S.E.2d 328, 340 (1996), *cert. denied by Hartman v. North Carolina*, 520 U.S. 1201, 137 L. Ed. 2d 708 (1997) (quoting *State v. Wright*, 302 N.C. 122, 127, 273 S.E.2d 699, 703 (1981)). "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 146-47, 38 L. Ed. 2d 368, 373 (1973).

A review of the entire instruction reveals that the phrase "beyond a reasonable doubt" was used at three pivotal points in the instruction on second-degree murder. The trial court instructed the jury as follows:

Ladies and Gentlemen, second degree murder is the unlawful killing of a human being with malice. Now, I charge for you to find the defendant, Lawrence Hanton, guilty of second degree

murder, *the State of North Carolina must prove two things beyond a reasonable doubt:*

. . . .

*If the State proves beyond a reasonable doubt* that the defendant, Lawrence Hanton, intentionally killed Donnell Allen Williamson, with a deadly weapon or intentionally inflicted a wound upon Donnell Allen Williamson with a deadly weapon that proximately caused his death, you may infer first that the killing was unlawful, and second that it was done with malice, but you are not compelled to do so. . . .

. . . .

So I charge, Ladies and Gentlemen, *if the State has proved to you beyond a reasonable doubt* that the defendant, Lawrence Hanton, intentionally and with malice killed Donnell Allen Williamson with a deadly weapon, and that the act of Lawrence Hanton was a proximate cause of the death of Donnell Allen Williamson, then it would be your duty to return a verdict of guilty of second degree murder.

On the other hand, if you are not satisfied as to one or more of these things, then it would be your duty to return a verdict of not guilty.

(Emphasis added.) Thus, when examined in context, the trial court's charge was proper and correctly charged the jury that the State was required to prove defendant's guilt "beyond a reasonable doubt."

Our Supreme Court addressed a similar question in *State v. Coffey*, 345 N.C. 389, 480 S.E.2d 664 (1997). There, the Supreme Court stated that " '[o]nly in a "rare case" will an improper instruction "justify reversal of a criminal conviction when no objection has been made in the trial court." ' " *Id.* at 396, 480 S.E.2d at 668 (citations omitted). The *Coffey* Court also stated that

[a]s this Court has previously held, no reversal will occur when the trial court's instructions, read as a whole and considered in context, reflect that the judge fairly advised the jury of every element of the offense charged and provided a correct statement of the law. *State v. Smith*, 311 N.C. 287, 290, 316 S.E.2d 73, 75 (1984).

*Id.* We find that the trial court accurately described the State's burden of proof in this case, and we therefore overrule this assignment of error.

## II. Defendant's Motion for a Continuance

[2] Defendant's second argument centers on the trial court's denial of his motion for a continuance. Defendant contends that on the night before his trial was to begin, he learned for the first time that Robert Taylor could positively identify him as the gunman. Defendant's attorney argued to the trial court that this new information warranted a continuance so that he could prepare a new strategy for his defense. Taylor had previously given a statement to police officers which described defendant in detail, but had not indicated that he was able to positively identify defendant by name as the gunman. Defendant's attorney conceded that he had received Mr. Taylor's statement some time before the trial, and had incorporated that information into his defense strategy.

The trial court denied defendant's motion to continue, but recessed court until 2:00 p.m. that day to allow defense counsel an opportunity to talk with defendant about the Taylor identification. During the trial, defense counsel vigorously cross-examined Robert Taylor and pointed out several inconsistencies between his testimony and that of Levi Miller, the other eyewitness.

Unless the trial court abuses its discretion, the denial or grant of a motion for continuance will not be grounds for reversal of a conviction. *State v. Trull,* 349 N.C. 428, 437, 509 S.E.2d 178, 185 (1998), *cert. denied by Trull v. North Carolina,* —— U.S. ——, 145 L. Ed. 2d 80 (1999). To prevail, defendant must show that the denial of his motion for a continuance was erroneous and that he suffered prejudice because of it. *State v. Branch,* 306 N.C. 101, 104, 291 S.E.2d 653, 656 (1982). Defendant has not been able to do so in this case. The trial court granted defendant's counsel additional time to talk with defendant about Taylor's testimony. Defendant's attorney effectively cross-examined Robert Taylor in an effort to show that Taylor did not actually see the gunman's face. Further, defendant's attorney had already studied the lighting of the crime scene, the weather conditions, and the description of the gunman and knew that Taylor could describe the shooter in detail.

Here, no abuse of the trial court's discretion has been shown by defendant, and this assignment of error is overruled.

### III. Defendant's Refusal to Give a Written Statement

[3] After defendant was arrested, he was transported to the Shelby Police Department, where he was advised of his *Miranda* rights by Detective Price. Price testified that defendant appeared to understand his rights and signed and initialed each individual right. Defendant then talked with Detective Price and Detective Haynes for some time, and was asked where he was at the time of the shooting on 27 July 1998. Defendant answered questions, but refused to write out a statement concerning his whereabouts. Detective Haynes testified that defendant told them "that he was no dummy and that he was not going to put anything in writing [and] don't try to trick me into your little games."

It is true that "the State may not introduce evidence that a defendant exercised his fifth amendment right to remain silent." *State v. Ladd*, 308 N.C. 272, 283, 302 S.E.2d 164, 171 (1983). Defendant argues that the officer's testimony was a comment on his exercise of the right to remain silent. We disagree.

We first note that defendant did not object at trial to the officer's testimony about his refusal to sign a written statement, and his objection is deemed waived. *See* N.C.R. App. P. 10(b)(1) (2000). However, in the interests of justice we have carefully reviewed this assignment of error.

The refusal to reduce a voluntarily given oral statement to writing is not an invocation of the right to remain silent. Such an invocation must be clear and unequivocal. Detective Price testified that he read the *Miranda* rights to defendant and that defendant then made an oral statement. Price later asked defendant if he would write out a statement about his whereabouts at the time of the alleged murder, and defendant refused to do so. There was no objection to any of Detective Price's testimony. It seems clear that after being advised of his right to remain silent, defendant waived that right by voluntarily speaking to the detectives about the events of 27 July 1998. A defendant who waives his rights and makes oral statements, but then refuses to make a written statement, may not thereafter complain that the oral statement is not admissible. *Connecticut v. Barrett*, 479 U.S. 523, 525, 93 L. Ed. 2d 920, 926 (1987). This is so because "Miranda gives the defendant a right to choose between speech and silence, and [the defendant] chose to speak." *Id.* at 529, 93 L. Ed. 2d at 928. Thus, under the holding of *Barrett*, defendant waived his right to remain silent by giving an oral statement, and his refusal to put the

statement in writing was not an invocation of the right to remain silent. Therefore, this assignment of error is without merit.

## IV. Evidence about Narcotics

[4] Defendant contends the trial court erred by admitting evidence which he characterized as "highly prejudicial testimony concerning his prior involvement with narcotics." We agree with the State that there was no reference in the evidence to any involvement by defendant with narcotics, and overrule this assignment of error.

Detective Endicott, a narcotics officer with the Shelby Police Department, testified that she worked in the Narcotics Division of the Police Department. She further stated that on the morning of 27 July 1998, she attempted to learn from her informants who had the nickname "Fu." As she began to testify about "a previous investigation," defendant objected, and the trial court conducted a voir dire in the absence of the jury. On voir dire, Detective Endicott testified that she learned from an informant the name of the person known as "Fu," and then went to her files of an earlier investigation and obtained a photograph of defendant to be used in a photographic lineup. The detective also testified on voir dire that 308 Black Street is at the end of the path which was apparently used by the murderer to approach the automobile in which Donnell Williamson, the victim, was seated, and was also the path used by the murderer to flee the scene of the crime. When Detective Endicott executed a search warrant in February 1998 as part of a narcotics investigation, she found defendant and three other persons at 308 Black Street, along with money orders with defendant's name on them. After hearing the testimony on voir dire, the trial court gave the following cautionary instruction to the prosecutor:

THE COURT: [S]he may testify that she observed him on a previous occasion, whenever it was, in the apartment. She was present in the apartment on [sic] previous occasion. She saw him there and that she also observed documents in the apartment. Stay away from the mention of search warrant.

. . . .

THE COURT: And stay away from the mention of the investigation. I'll limit it to that. She can testify that she was there on whatever occasion it was, . . . observed him there . . . saw documents with his name on it . . . , and she's familiar with the area and familiar with where the path starts. Do not mention the word

investigation. Do not mention the word search warrant, drug charges, or anything like that.

The detective then testified before the jury about seeing defendant at the 308 Black Street address and finding papers there bearing defendant's name. Defendant argues that the testimony of Detective Endicott was inadmissible under N.C. Rule of Evidence 404(b). That rule states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C. Gen. Stat. § 8C-1, Rule 404(b) (1999). However, the State did not introduce evidence of other "crimes, wrongs, or acts" committed by defendant. His photograph was used to prove identity, which is permissible under Rule 404(b). Both Williamson and Levi Miller identified the gunman as "Fu." The testimony by Detective Endicott did not show that defendant had committed other crimes, wrongs or acts, nor did it show that defendant had a propensity to murder. It aided the jury in understanding the connection between the nickname "Fu" and the identity of defendant. Further, the papers found at 308 Black Street showed a link between defendant and that location, that defendant either lived there or was there on a frequent basis. Still further, the testimony tended to show that defendant had knowledge of the path. In turn, this makes a fact of consequence more probable, and is permissible under Rule 404(b). The use of the evidence was in accordance with our Rules of Evidence, and the trial court's cautionary instruction provided adequate protection to defendant.

Defendant does not contend that the State violated the trial court's cautionary instructions, but argues that, because Detective Endicott was a narcotics officer, the jury could infer that defendant was in some way connected to narcotics. Even if we assume that the jury drew such an inference, any possible prejudice to defendant would be slight in light of other strong evidence of defendant's guilt. Thus, this assignment of error is also without merit.

### V. Defendant's Prior Record Level

**[5]** Finally, defendant assigns error to the trial court's calculation of his prior record level; specifically, to the number of points assigned

to his out-of-state convictions. Defendant contends that he should have been a Level IV offender, not a Level V. For the purposes of determining prior record levels for felony sentencing,

> a conviction occurring in a jurisdiction other than North Carolina is classified as a Class I felony if the jurisdiction in which the offense occurred classifies the offense as a felony . . . . If the State proves by the preponderance of the evidence that an offense classified as either a misdemeanor or a felony in the other jurisdiction is substantially similar to an offense in North Carolina that is classified as a Class I felony or higher, the conviction is treated as that class of felony for assigning prior record level points.

N.C. Gen. Stat. § 15A-1340.14(e) (1999). Defendant contends the State did not meet its burden, and that the trial court erred by assigning the convictions a total of eighteen points, rather than the maximum of twelve points they would be assigned if they were all classified as Class I felonies. Defendant correctly points out that the State presented no formal evidence on the matter, except the prosecutor's statement to the trial court and his presentation of a work sheet and a computer printout. The record shows the following exchange between defense counsel, the prosecutor, and the trial court:

> [THE PROSECUTOR]: [T]he State would like to present a work sheet on Mr. Hanton. If I may approach, Your Honor.

> THE COURT: All right.

> [THE PROSECUTOR]: Mr. Hanton, by the State's reckoning, has 18 prior points, making him a Level 5.

> . . . .

> THE COURT: Mr. Farfour, with the exception of the kidnapping charge, is there any disagreement about the other convictions on there?

> [THE DEFENSE ATTORNEY]: No, Your Honor.

> THE COURT: All right.

> [THE PROSECUTOR]: If I may approach, Your Honor, with that and the computer documentation supporting the charges.

N.C. Gen. Stat. § 15A-1340.14(a) provides that the prior record level of a felony offender is determined by calculating the sum of points assigned to each of the offender's prior convictions which the

court finds to have been proven. There is no distinction between in-state and out-of-state convictions in N.C. Gen. Stat. § 15A-1340.14(a), nor does the section preclude the court from accepting stipulations by the attorneys.

The State characterizes this as an issue of first impression in a non-plea bargain case. In an appeal following a judgment entered based upon a "plea bargain," we have stated that if a defendant "essentially stipulate[s] to matters that moot the issues he could have raised under [N.C. Gen. Stat. § 15A-1444] subsection (a2), his appeal should be dismissed." *State v. Hamby*, 129 N.C. App. 366, 369, 499 S.E.2d 195, 196 (1998). We see no reason to treat cases in which a defendant is sentenced following a conviction by a jury differently from sentences entered as the result of a "plea bargain."

N.C. Gen. Stat. § 15A-1340.14(f) allows proof of *prior convictions* to be made by stipulation of the parties or any other method the court finds to be reliable. The State asserts that in the colloquy between the prosecutor, trial court, and defense counsel, defendant stipulated to the State's proposed classifications and point total, and stipulated that the offenses were substantially similar to the respective North Carolina offenses. While we agree that a defendant might stipulate that out-of-state offenses are substantially similar to corresponding North Carolina felony offenses, we do not agree that defendant did so here.

It appears that defendant denied that he had been convicted of a New York kidnapping charge which appeared on the State's record level work sheet. The prosecutor then removed the kidnapping charge from the work sheet. When the trial court asked defendant's counsel whether "with the exception of the kidnapping charge, is there any disagreement with the other convictions on there?", counsel answered "No." That statement might reasonably be construed as an admission by defendant that he had been convicted of the other charges appearing on the prosecutor's work sheet, but it is not clear that defendant was stipulating that the out-of-state convictions were substantially similar to felony charges under North Carolina law which are classified as Class I felonies or higher. As it appears likely, however, that the State relied on the statement of defendant's counsel in failing to offer evidence about the nature of defendant's out-of-state convictions, the matter must be remanded to the trial court for resentencing. In the interests of justice, both the State and defendant may offer additional evidence at the resentencing hearing. Unless the State proves by a preponderance of the evidence that the out-of-state

felony convictions are substantially similar to North Carolina offenses that are classified as Class I felonies or higher, the trial court must classify the out-of-state convictions as Class I felonies for sentencing purposes.

In summary, it appears there is no error in defendant's conviction, but the case must be remanded to the Superior Court of Cleveland County for resentencing.

No error and remanded for resentencing.

Judges WALKER and McGEE concur.